ASIATIC PETROLEUM CORP. *v.* UNITED STATES (No. 4580)[1]

United States Court of Customs and Patent Appeals, May 10, 1948

*Sharretts & Hillis (Edward P. Sharretts of counsel) for appellant.*
*Paul P. Rao, Assistant Attorney General (Sybil Phillips, special attorney, of counsel), for the United States.*

[Oral argument February 10, 1948, by Mr. Sharretts and Miss Phillips]

Before GARRETT, Presiding Judge, and HATFIELD, and JACKSON, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, C. D. 1050, overruling the protest of importer

[1] C. A. D. 389.

seeking recovery of moneys assessed and collected by the Collector of Customs at the port of New York, under section 3422 of the Internal Revenue Code, as modified respecting rate by the reciprocal trade agreement with Venezuela, T. D. 50015, upon 220,930 gallons of imported oil withdrawn from warehouse for use as fuel supplies on the steamship *Panamanian*, a vessel engaged in foreign trade. Assessment was made at the rate of one fourth of 1 cent per gallon.

Under the Tariff Act of 1930 imported oil of the kind here involved was entitled to entry free of duty, but by section 601 (c) (4) of the Internal Revenue Act of 1932 (which became section 3422 of the Internal Revenue Code), it was provided that a tax of ½ cent per gallon should be assessed upon imported fuel oil and that the tax be collected in the same way that customs duties are collected. For every administrative purpose, the tax was made a customs tax.[1]

Following the passage of the provision in the 1932 Internal Revenue Act, it developed that many of the vessels engaged in foreign trade which theretofore had purchased their fuel oil in the United States changed their practice and began to purchase it in the ports of those foreign countries where it could be obtained without the payment of a tax, thus depriving domestic dealers in fuel oils of much business.[2]

This led to the enactment of legislation providing that vessels engaged in foreign trade might obtain, under regulations prescribed by the commissioner with the approval of the Secretary of the Treasury, any article sold for use as fuel supplies without any tax, whether in the form of a customs duty or an internal revenue tax, being imposed upon it. This legislation was embodied in an amendment to section 309 of the Tariff Act of 1930 which amendment was carried into the Customs Administrative Act of June 25, 1938, 19 U. S. C. § 1309.

The case is somewhat complicated because it is necessary to consider, *in pari materia*, provisions of the Tariff Act of 1930, as amended by subsequent acts, along with provisions of the Internal Revenue Act of 1932, as amended by subsequent acts.

Prior to the passage of the 1932 Internal Revenue Act, section 309 of the Tariff Act of 1930 had made provision for exempting from customs duties and internal revenue tax supplies for vessels of the United States actually engaged in foreign trade, and regulations made under that section were in force and effect when the 1932 internal revenue act was passed. Those regulations, as of course, became applicable, insofar as pertinent and valid, to fuel oil used as vessel supplies. Also, all pertinent and valid regulations subsequently made under pertinent statutes or amendments to pertinent statutes became applicable.

According to the record before us the fuel oil, the tax upon which is

---

[1] The rate was changed to ¼ cent per gallon by the reciprocal trade agreement with Venezuela, T. D. 50015, 75 Treas. Dec. 165, proclaimed in November 1939, and the rate is not here in dispute.

[2] A discussion of this question will be found in the Congressional Record of May 11, 1933, Vol. 77, Part 3, 73d Congress, 1st Session, pages 3212 and 3214.

here involved, was entered in warehouse November 16, 1939, and withdrawn as vessel supplies March 12, 1940. The statute which governs is that embodied in the Customs Administrative Act of 1938. The applicability of a regulation (art. 470 of Customs Regulations of 1937) is, in the final analysis, the real issue in the case.

There is no dispute about the facts. After the collector had made the assessment, protest on behalf of the importer was duly made, and the collector's report in response to the protest, which was introduced in evidence, stated

Protest No. 21551, filed in this office on 12/5/1941, concerns part of a lot of 2,689,458 gallons of fuel oil entered, under Manufacturing Warehouse Entry No. 81, in the bonded warehouse of the Asiatic Petroleum Corporation at Bayonne, New Jersey. The part referred to consisted of 220,930 gallons withdrawn from warehouse under withdrawal Entry VS–12537 on 3/12/40, for use as fuel supplies on the Panamanian S/S "Panamanian".

This vessel was actually engaged in foreign trade, within the meaning of Section 309 (A) of the Tariff Act of 1930, and its supply of oil would be free of tax under said Section had the parties in interest conformed to the regulations of the Secretary of the Treasury.

Article 470 of the Customs Regulations of 1937 requires the Master or other officer of the vessel having knowledge of the facts to declare under oath that such supplies have been used aboard and that no portion thereof was landed within the limits of the United States or any of its possessions.

Since this was not done the 220,930 gallons were assessed at ¼¢ per gallon under Section 3422 of the Internal Revenue Code of 1939 and T. D. 50015.

A stipulation of facts agreed to by counsel for the respective parties is in entire conformity with the collector's report, and it need not be reproduced here. It was stipulated that all regulations except article 470 referred to in the collector's report were complied with, and that article 470 was not complied with.

For convenience of comparison we here reproduce in parallel columns the pertinent provisions of section 309 of the Tariff Act of 1930, (which, with the regulations thereunder, was in force at the time of the passage of the 1932 Internal Revenue Act) and the pertinent provision of section 309 as amended by the Customs Administrative Act of 1938.

SEC. 309, Tariff Act of 1930.

(a) EXEMPTION FROM CUSTOMS DUTIES AND INTERNAL-REVENUE TAX.—Articles of foreign or domestic manufacture or production may, under such regulations as the Secretary of the Treasury may prescribe, be withdrawn from bonded warehouses or bonded manufacturing warehouses free of duty or internal-revenue tax for supplies (not including equipment) of vessels of war, in ports of the United States, of any nation which may reciprocate such

SEC. 309, as amended by the Customs Administrative Act of 1938.

(a) Exemption from customs duties and internal-revenue tax.—Articles of foreign or domestic manufacture or production may, under such regulations as the Secretary of the Treasury may prescribe, be withdrawn from bonded warehouses, bonded manufacturing warehouses, or continuous customs custody elsewhere than in a bonded warehouse free of duty or internal-revenue tax for supplies (not including equipment) of vessels of war, in ports of the

privilege toward the vessels of war of the United States in its ports, or for supplies (not including equipment) of vessels of the United States employed in the fisheries or in the whaling business, or actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions, but no such article shall be landed at any port or place in the United States or in any of its possessions.

United States, of any nation which may reciprocate such privilege toward the vessels of war of the United States in its ports, or for supplies (not including equipment) of vessels employed in the fisheries or in the whaling business, or actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions, or for supplies (not including equipment) of aircraft registered in the United States and actually engaged in foreign trade or trade between the United States and any of its possessions, or for supplies (including equipment), maintenance, or repair of aircraft registered in any foreign country and actually engaged in foreign trade or trade between the United States and any of its possessions, where such trade by foreign aircraft is permitted.

(b) Drawback.—Articles of domestic manufacture or production laden as supplies upon any such vessel shall be considered to be exported within the meaning of the drawback provisions of this Act.

(b) Drawback.—Articles withdrawn from bonded warehouses, bonded manufacturing warehouses, or continuous customs custody elsewhere than in a bonded warehouse and articles of domestic manufacture or production, laden as supplies upon any such foreign vessel or any such vessel or aircraft of the United States or laden as supplies (including equipment) upon, or used in the maintenance or repair of, any such foreign aircraft, shall be considered to be exported within the meaning of the drawback provisions of this Act.

(c) Articles removed in, or returned to, the United States.—Any article exempted from duty or tax, or in respect of which drawback has been allowed, under this section or section 317 of this Act and thereafter removed in the United States from any vessel or aircraft, or otherwise returned to the United States, shall be treated as an importation from a foreign country.

\* \* \* \* \*

Various regulations, in force at the time of the importation here involved, were complied with and those need not be reproduced verbatim. It is sufficient for the purpose of this case to say that a bond was required upon withdrawal of the oil from warehouse for use as ship supplies.

Article 470 of Customs Regulations of 1937[3] which was not complied with reads:

Art. 470. Cancelation of bonds.—An affidavit of the master or other officer of the vessel having knowledge of the facts, showing that such supplies have been used on board the vessel and no portion thereof landed within the limits of the United States or any of its possessions, must be produced within six months from the date of the withdrawal to cancel the bond provided for in article 466(c). The six-months' period may be extended as provided in article 1269. Such an affidavit must likewise be produced when the withdrawal is made by the principal on the warehouse or rewarehouse entry bond to secure credit on such bond for the free withdrawal, except where the vessel departs from the port of withdrawal directly for a foreign port.

It is asserted, in effect, in the brief on behalf of appellant, that article 470 was promulgated May 8, 1937 (T. D. 48964, 71 Treas. Dec. 771) as an amendment to article 461 of the Customs Regulations of 1931; that both articles were promulgated to administer sections 309 (a) and 624 (the section providing for general regulations) of the Tariff Act of 1930; and that no new regulation was issued to put into operation the statute embodied in the Customs Administrative Act of 1938 (enacted June 25, 1938) until "the promulgation of the Customs Regulations of 1943."

It is pointed out in the brief for appellant that the final clause of section 309 of the Tariff Act of 1930, *supra*, which act was in force at the time article 470, *supra*, of the 1937 Customs regulations was promulgated, read:

* * * but no such article [withdrawn for use as supplies] shall be landed at any port or place in the United States or in any of its possessions.

It is then said:

Obviously, the provision in Article 470 of the Customs Regulations of 1937, requiring a master's affidavit that the supplies had not been landed within the limits of the United States or in any of its possessions, had reference to the above quoted clause of the statute as it then existed and was intended to administer that requirement in the statute.

Then it is said in effect that the clause of section 309 of the 1930 act prohibiting the landing of supplies in the United States is deleted and that subsection (c) of that portion of the Customs Administrative Act of 1938 amending section 309 of the Tariff Act of 1930 permits the landing of such supplies in the United States provided that upon landing they be treated as an importation from a foreign country. It is argued that the deletion of that provision completely nullified that portion of regulation article 470, *supra*, which requires an oath that the supplies were not landed in the United States or in any of its possessions, and that the portion which requires an oath that the supplies had been used aboard the vessel "attempts to read into the statute a requirement which is not there."

[3] In connection with Article 470, see T. D. 48495, (70 Treas. Dec. 238) dated August 21, 1936; T. D. 48788, 71 Treas. Dec. 175, dated January 28, 1937; and T. D. 48964, (71 Treas. Dec. 771) dated May 8, 1937.

To state the matter in somewhat different phraseology, it is the position of appellant, as we understand it, that the fuel oil in question having been shown, according to the stipulation, to have been withdrawn from warehouse and laden on the vessel for use as supplies, it became at once entitled to exemption from tax and the requirement of an affidavit that it was actually used as supplies is not only unnecessary but goes beyond any requirement of statute and is therefore illegal, since section 1309 U. S. C. (sec. 309 of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938) "specifically allows exemption from duties and internal revenue taxes, or the drawback of such duties and taxes if paid, to articles laden as supplies upon a vessel actually engaged in foreign trade."

. In this connection appellant cites this court's decision in the case of *United States* v. *Gulf Oil Corporation*, 32 C. C. P. A. (Customs) 133, C. A. D. 297.

In that case bunker fuel oil produced and manufactured in the United States from imported crude petroleum, duty upon which crude material had been paid by the appellee, was laden upon United States ships engaged at the time of lading in foreign trade. It was so laden for use as fuel supplies. After a round trip to a foreign country, the vessels changed registry and became engaged in the coastwise trade. At the time of changing registry much of the oil (in the aggregate 1765 barrels) originally laden on the vessels remained unused. It was not landed in the United States or any of its possessions. The importer, which, as has been stated, had paid the duties on the crude material imported, filed claims for drawback on all the fuel oil originally laden on the vessels. The collector allowed drawback on the quantity used in making the round trip to and from the foreign country, but refused it as to the quantities remaining after that trip. This court, JACKSON, Judge, dissenting, affirmed the judgment of the United States Customs Court entered in conformity with its decision which was to the effect that drawback should be allowed on the entire quantity originally laden on the vessels.

The decision was based upon the statute which provided, in effect, that articles laden upon a vessel, as vessel supplies, should be considered to be exported when laden.

Counsel for appellant argues, in effect, that the decision in that case is in point here. Counsel for the Government argue that the decision is not applicable here.

Whether the trial court's attention was directed to that decision does not appear from the record. Its decision makes no reference to it.

We are of opinion that the principle underlying the decision in that case is applicable here.

When appellant here withdrew the fuel oil from a manufacturing bonded warehouse for supplies for a vessel engaged in foreign trade

it executed bond in conformity with the pertinent regulations. The fuel oil was then laden on board a vessel engaged in foreign trade. When so laden it became an exported article, just as the oil involved in the *Gulf Oil Corporation* case, *supra*, did, and there was no further Government interest in it from the tax standpoint.

For the reasons stated the judgment of the United States Customs Court is *reversed* and the cause is *remanded* for further proceedings in conformity with this decision.

By reason of illness, O'CONNELL, Judge, was not present at the argument of this case and did not participate in the decision.